**\*\*\* FOR PUBLICATION IN WEST'S HAWAI‘I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCOT-23-0000516
22-MAY-2026
09:12 AM
Dkt. 91 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---oOo---

_____

DREW GUTSCHMIDT, ANDREW BLACK, MICHAEL MORRISON, TERRI MORRISON,
ASH SAULSBURY, and LILA TRETIKOV, Individuals,
Appellants,

vs.

MAUI PLANNING COMMISSION, COUNTY OF MAUI; and
GOODFELLOW BROS., LLC., a domestic limited liability company,
Appellees.

_____

SCOT-23-0000516

APPEAL FROM THE MAUI PLANNING COMMISSION
(MPC DOCKET NO. SUP 220210001)

McKENNA, ACTING C.J., GINOZA, AND EDDINS, JJ.,
AND CIRCUIT JUDGE JOHNSON, IN PLACE OF DEVENS, C.J., RECUSED,
AND CIRCUIT JUDGE DeWEESE, ASSIGNED BY REASON OF VACANCY

MAY 22, 2026

OPINION OF THE COURT BY GINOZA, J.

## I. Introduction

Appellants are Drew Gutschmidt, Andrew Black, Michael
Morrison, Terri Morrison, Ash Saulsbury, and Lila Tretikov

(**Appellants**), all residents or owners of property in the Makila Plantation neighborhood in Launiupoko, Maui. The Appellee is Goodfellow Bros., LLC (**Goodfellow**), who applied for a special use permit (**SUP**) to engage in rock-crushing on approximately twelve acres of fallow agricultural land about a mile away from the Makila Plantation neighborhood. At issue in this matter is whether the Maui Planning Commission (**MPC**) properly denied Appellants' untimely petition to intervene in Goodfellow's SUP public hearing. Appellants also challenge the issuance of the SUP. We hold that the MPC properly denied Appellants' petition to intervene because Appellants did not show good cause as to why they waited until the eve of the public hearing to file a petition to intervene. Therefore, we do not reach the merits of Appellants' challenge to the issuance of the SUP.

## II.  Background

### A.  Goodfellow's SUP Application

In January 2021, Goodfellow submitted a Land Use Commission (**LUC**) Special Permit Application to the Maui Planning Department (**MPD**) for a project titled "Rock Crushing Site Makila Ranches II Lot 10." The project land is zoned for agricultural use under the State Land Use Plan, the Maui Island Plan, and the West Maui Community Plan. It is outside the growth boundaries of the Maui Island Plan. Goodfellow described the property as "undeveloped, vacant, and fallow land that is enclosed by a

2

fence[,]" surrounded by "fallow, vacant agricultural lands in all directions."  The soil is characterized as "generally stony and silty clay."

Goodfellow proposed to use the land as a "temporary rock crushing facility" that will process rocks for commercial use as "aggregate for local construction."  The rocks would be extracted from the site itself or trucked over from off-site.  The rocks would then be crushed and stockpiled on-site until sold.  The project was intended to "establish a local source for aggregate" for West Maui construction projects.

Goodfellow did not plan to crush rock materials every day.  It acknowledged that its operations would likely produce dust and noise.  It proposed mitigating these impacts using dust screens and non-potable water, as well as limiting operations to daylight hours.  Goodfellow estimated that, on average, five individuals and two vehicles would work onsite.  There would be a trailer for administrative purposes and no permanent structures erected.  Crushing equipment (excavators, loaders, crushers, screens, and conveyors) would be mobile.

Positive impacts included diverting rocks and boulders from the Central Maui Landfill and from illegal dumping on public and private property.  Goodfellow also stated that its rock-crushing operations would decrease traffic from

construction vehicles coming to West Maui from Central and South Maui quarries.

Goodfellow asserted that the proposed project was not a permissible use under Hawai'i Revised Statutes (**HRS**) § 205-4.5 (2017) in the State agricultural district, but that the project was an "unusual and reasonable use" <u>with</u> a special use permit, under HRS § 205-6 (2017) and Hawai'i Administrative Rules (**HAR**) § 15-15-95 (eff. 2019).  Goodfellow also noted that "mining and resource extraction" are special uses under Maui County Code (**MCC**) Chapter 19.30A.060 (eff. 2016) if a special use permit is obtained.  MCC § 19.04.040 (eff. 2018) (titled "Definitions") defines "Resource extraction" as "activities engaged in the exploration, mining and processing of natural deposits of rock, gravel, sand, and topsoil."  As the property was under fifteen acres in size, the SUP would be processed by the MPD and acted upon by the MPC.  Goodfellow asked that the permit be for fifteen years.

B.    **Notification of the Public Hearing**

Starting in 2022, Goodfellow engaged in community outreach.  On September 22, 2022, Goodfellow coordinated with the Makila Plantation Homeowners Association to hold an informational Zoom meeting with homeowners about its rock-crushing proposal.  Appellant Black attended that meeting.

On July 3, 2023, Goodfellow mailed a letter of notification to all owners and recorded lessees within 500 feet of the subject property, to whom notice of the SUP application was required to be given. The letter included a location map; described the SUP application; and informed them of the scheduled August 8, 2023 hearing date, time, and place.

On July 7, 2023, MPC published a notice in The Maui News notifying the public of a meeting on August 8, 2023 regarding Goodfellow's request for the SUP. The notice also informed the public of the following information, highlighted in bold: "The deadline for the filing of a timely petition to intervene if the first public hearing date is August 8, 2023 is July 25, 2023."

On July 20, 2023, the Makila Plantation Homeowners Association forwarded an email from Goodfellow inviting homeowners to an informational meeting about its SUP application.

On August 1, 2023, MPC published notice of its regular remote public hearing on its website. Goodfellow's SUP application was on the agenda. Also hyperlinked to the agenda was MPD's Report and Recommendation, which recommended that the MPC approve Goodfellow's SUP for five years, with conditions.

## C.   Written Testimony from the Appellants

Between August 4 and 7, 2023, each of the Appellants submitted written testimony to the MPC.  They each (1) raised concerns with noise, dust, water use, and traffic; (2) asserted that Goodfellow should have given them formal notice of the public hearing, even though such notice was not required because Appellants are not adjacent property owners within 500 feet of the site; and (3) stated their desire to obtain legal counsel.

Appellants questioned Goodfellow's activities on the property.  Appellants Michael and Terri Morrison stated, "Per our discussion with Goodfellow the other day, they have no plans on doing any type of mineral processing on dirt from this site, just rock crushing, storing rock from numerous other locations and then hauling rock to and from the location."  Appellant Saulsbury doubted that Goodfellow would even engage in rock-crushing on the property.  He stated that Goodfellow posted an "admission . . . on a private website . . . on July 14[, 2023]" that it had "no intent of mining anything."  He included a screenshot of the website in which Goodfellow did not expressly state that it had "no intent of mining anything" but did state that it could not eliminate the "rock-crushing" component of its application because it was that component that qualified its activities as a "special use" (i.e., "mining and resource extraction") in the agricultural district.

6

The Appellants asked the MPC to defer, deny or suspend the SUP application.

**D.    Appellants' Petition to Intervene**

On August 7, 2023, twenty hours before the scheduled hearing, Appellants submitted a Petition to Intervene to the MPC.  Appellants emailed the petition to the MPC at 1:06 p.m.  Appellants stated that they "own property and/or reside in the nearby Makila Plantation neighborhood in Launiupoko[,]" and their "homes are located within approximately one mile of the project site. . . ."  They brought their Petition to Intervene pursuant to Rules of Practice and Procedure for the Maui Planning Commission (**RPPMPC** or **MPC rules**) § 12-201-40 (eff. 2001), which is titled "Petition filing," and which states the following:

> (a) Petitions to intervene shall be in conformity with section 12-201-20 herein and shall be filed with the commission and served upon the applicant no less than ten days before the first public hearing date.  Untimely petitions will not be permitted except for good cause, but in no event will intervention be permitted after the commission has taken the final vote on the matter before it.
>
> (b) The petition to intervene shall be accompanied by a filing fee in the amount established in the county budget.

The Appellants conceded that their "petition is not being submitted ten days prior to the first public hearing date on August 8, 2023," but stated that it was submitted "prior to a

7

final vote on the matter" and was "late for good cause."  They

asserted the following:

> The [Appellants] only recently learned of the Application and its potential adverse effects on neighboring properties.  The [Appellants] were first made aware of the existence of the Application on July 20, 2023 [through an] email from the Makila Homeowner's Association.  The [Appellants] were invited to and participated in an August 3, 2023 information session by the Goodfellow [sic].  Subsequent to the information session, the [Appellants] received, for the first time, the Maui Planning Commission agenda for the public hearing including full details of the application and the Maui Planning Department report.  Given the preceding events, the [Appellants] did not have the information to decide to intervene by July 25, 2023, ten days prior to the public hearing, and were therefore ill positioned to petition to intervene on a timely basis.

On the merits of the SUP application, the Appellants argued that

they were concerned about the dust, noise, heavy truck traffic,

increased demand on non-potable water, and impact on peace and

quiet that the rock-crushing operation would have on their

properties, their agricultural activities, and on Launiupoko

Beach Park.

**E.    The Public Hearing on the SUP**

On August 8, 2023, the MPC held a public hearing on

Goodfellow's SUP application, which it characterized as a

contested case.  Goodfellow made a presentation, noting that,

"[s]tarting from last year [2022]," Goodfellow "had several

meetings with the community, including the nearby [homeowners

associations], . . . Councilmember Paltin and stakeholders . . .

Uilani Kapu of the Aha Moku Council, Kai Nishiki and the West

Maui Land Company."  The hearing was then open to public

8

testimony, and Appellants Gutschmidt, Saulsbury, Black, and Michael Morrison each testified. Then a community member testified in support of the project and stated that four out of the six intervenors did not occupy the homes they own in Makila Plantation. He speculated that the intervenors did not know of the rock-crushing proposal because they do not live on Maui full-time. Another community member also testified in support of the project and criticized opponents as "Launiupoko folks": "largely affluent, largely not living there, and it feels really like NIMBY. . . ."

The MPC then took up the petition to intervene. Black testified that he received a forwarded email to the Makila Plantation Homeowners Association from Goodfellow, sent on July 20, 2023, inviting homeowners to learn about Goodfellow's SUP application on August 3, 2023. He stated this was the first time he had heard of the public hearing scheduled for August 8, 2023.

One of Goodfellow's representatives, Leilani Pulmano (**Pulmano**), addressed Black's testimony. She stated that Black was present at an informational Zoom meeting Goodfellow held with homeowners of Makila Plantation on September 22, 2022 and knew about Goodfellow's proposal then. She also testified that Goodfellow was prejudiced by the untimely petition to intervene because it was "unable to secure an attorney." Black then

testified that the September 2022 Zoom meeting was "vague," and he did not know Goodfellow was seeking a SUP.

At that point in the hearing, two of the six commissioners stated that they had not received the petition to intervene. The proceedings were recessed for those two commissioners to review the petition. Once the hearing was reconvened, commission counsel stated that the MPC could grant the petition to intervene, in which case the MPC "would move to a sort of more formal contested case hearing and [it would] be done for today with the item." Commission counsel also stated that the MPC could deny the petition to intervene, then "move forward with . . . decision making. . . ."

One of the commissioners then asked commission counsel to define "good cause." Counsel stated that it was a "sufficient reason" or a "good . . . excusable reason" to have missed the intervention deadline. Counsel stated that the term was broad and gave the commission discretion.

Pulmano then further testified to address Black's testimony. She testified that Goodfellow was only required to give notice to adjoining or abutting landowners, so its efforts at reaching out to two nearby homeowners associations was "[a]bove and beyond" that requirement. Pulmano further testified that the Makila Plantation Homeowners Association's property manager set up the informational meeting with

homeowners via Zoom in September 2022. She stated that Goodfellow explained at that informational meeting that it was seeking a special use permit. The SUP application had been submitted to MPD in January 2021.

Then, once the MPD notified Goodfellow that its SUP application was coming up for a public hearing, Goodfellow emailed the homeowners association property managers again on July 5, 2023 to set up a follow-up meeting with owners. Pulmano testified that the Makila Plantation Homeowners Association property manager was on vacation at the time but acknowledged Goodfellow's email on July 14, 2023. The property manager sent out an email to homeowners on July 20, 2023, and set up the meeting on August 3, 2023.

Black then testified that he attended the September 2022 informational Zoom meeting but could confirm that Gutschmidt, Saulsbury, and Tretikov did not attend that meeting, and was not sure if the Morrisons attended. One of the commissioners then asked Black if he was "a full-time resident of Hawaii." Black stated that he lived on Maui and in British Columbia, Canada.

Appellant Saulsbury then testified that he had not attended the informational Zoom meeting in September 2022 and became a full-time Maui resident a month later. Michael Morrison also testified that he and his wife did not attend the

September 2022 informational Zoom meeting because they were "not in the state" at the time. He stated that he and his wife are full-time Maui residents. Both Saulsbury and Michael Morrison testified that the first time either had heard details of the SUP application up for public hearing was on August 3, 2023.

Pulmano countered that a public notice of the hearing was published in The Maui News on July 7, 2023. A Maui County staff member noted that all of the SUP application documents were available online for public review at that time and had been available since the end of January 2021.

One of the commissioners moved to deny the petition to intervene because "the applicant [Goodfellow] and the commission did not have time to prepare" for it. The motion was seconded by another commissioner, who added the following:

> Just to our intervenors, you know, living away from where is submitting of legal papers tend to be really unkind to those who live farther and being from a person who lives two hours away just to be able to file something. I've taken these kind of deadlines quite seriously. And so, with the amount of time that you had and you were informed about the information, I do feel that you had a sufficient amount of time to be able to submit your papers on a timely matter. So, on the basis of the late notice is the reason why I am denying the intervention.

(Unedited.) Two other commissioners added the following comments:

> Dr. Deakos: [I]t sounds to me like the applicant made every effort and went above and beyond to notify beyond what the requirements were. I don't think there was anything malicious on either side. I do feel the intervenors, you know, navigating those . . . the map sites and knowing where to find stuff. I try to track stuff all the time and, and it gets past me. So, it's I think it was

12

> an honest mistake. I don't think there's any malicious intent with the intervention. But you know, there are rules for the deadline for application and unfortunately, that deadline was missed. So, I would probably support the denial. Thank you.
>
> . . . .
>
> Ms. Thayer: I would just say that I'm supporting what the other commissioners have said, that this was an untimely filing. And then the next question after that is was good cause shown. And as Commissioner Deakos mentioned and the other commissioners, that there was lots of notice prior to this application or intervention being filed. But having said that, I do understand how hard it is for somebody who's not in this world to find this stuff online. But it sounds like it was known that there was a rock crushing facility well before ten days prior to this public hearing. So, based on that, I side with the motion.

The MPC voted 6-0 to deny the petition to intervene.

The public hearing on Goodfellow's SUP application resumed. Pulmano clarified that Goodfellow is "not quarrying or mining . . . on the site." She stated that Goodfellow had previously asked to remove the rock-crushing activity in its SUP application but was told by the MPD that it could not. Pulmano then stated that her understanding was that Goodfellow could just store rock materials on the subject property, which it was willing to do. At the end of the public hearing, the MPC voted to approve Goodfellow's SUP application, with amended conditions and additional conditions. Two of the additional conditions were (1) that there would be "no coring, mining or rock crushing" on the property; and (2) that "the aggregate and material created and/or stored on the property shall be utilized for projects in West Maui."

## F.    The MPC's Decision

On April 30, 2024, the MPC filed its "Findings of Fact, Conclusions of Law, and Decision and Order Denying a Petition to Intervene for a Land Use Commission Special Permit for Goodfellow Bros. LLC" (**Decision**).  The MPC found that Appellants had sufficient notice of the public hearing and sufficient time to prepare a petition to intervene.  It also found that Appellants' petition to intervene was untimely filed without good cause.  The MPC's conclusions of law were as follows:

> 2.  The [Appellants] failed to file a petition to intervene ten days prior to the public hearing date as required by Rule 12-201-40 of the Rules of Practice and Procedure of the Maui Planning Commission.
>
> 3.  The term "good cause," as used in Rule 12-201-40 of the Rules of Practice and Procedure of the Maui Planning Commission, requires the commission to decide whether proposed intervenors that filed untimely petitions "have sufficient reason to have not filed within the ten-day period." (Exhibit B, p.42; see also Eckard Brandes, Inc. v. Dep't of Labor & Indus. Relations, 146 Hawai'i 354, 363, 463 P.3d 1011, 1020 (2020) (defining "good cause" as "sufficient reason, depending upon the circumstances of the individual case, and that a finding of its existence lies largely in the discretion of the court.").
>
> 4.  The [Appellants] did not have "good cause" to file their petition less than 24 hours before the public hearing on the application, over nine days later than the filing deadline provided by Rule 12-201-40.

There was no mention of Appellants' residency status in the Decision.  Appellants timely filed a notice of appeal to this court.

14

## III. Discussion

Appellants raise the following points of error in their opening brief:

> The [MPC] reversibly erred by:
>
> (1) Denying Appellants' petition to intervene where Appellants' property rights required due process, consisting in a contested case hearing in accord with HRS chapter 91, the Hawai'i Administrative Procedures Act ("HAPA").
>
> . . . .
>
> (2) Denying Appellants' petition to intervene based on an incorrect analysis of its rules for intervention because it incorrectly interpreted "good cause" as requiring Appellants to demonstrate an absence of opportunity to have filed ten working days before the hearing or the Applicant's noncompliance with notice requirements.
>
> . . . .
>
> (3) Plainly erred by considering Appellants' residency status in determining to deny their petition to intervene in violation [of] equal protection of laws of the Fourteenth Amendment of the U.S. Constitution and article I, §5 of the Hawai'i Constitution.
>
> . . . .
>
> (4) Approving the Department report and Applicant's SUP application for special uses consisting [of] "mining and resource extraction" in the agricultural district in violation of requirements of Maui County Code (MCC) chapter 19.30A.060 and Hawai'i Administrative Rules (HAR) §15-15-95 . . . because:
>
>> a. Applicant does not intend to conduct mining or resource extraction.
>>
>> . . . .
>>
>> b. Applicant's proposed operations do not meet the criteria and guidelines for permitting special uses in the agricultural district.
>>
>> . . . .
>>
>> c. Appellants' property rights required the [MPC] to hold a contested case hearing prior to considering the application.

As a preliminary matter, we note that Appellants argue they had "standing to intervene in Commission proceedings." Standing is not at issue in this appeal. What is at issue is whether the Appellants should have had their petition to intervene accepted by the MPC in the first instance because they had shown "good cause" for its untimely filing.

## A. The MPC's interpretation of "good cause" in RPPMPC Rule 12-201-40 was proper.

The Appellants' second point of error concerns the interpretation of the term "good cause" in RPPMPC Rule 12-201-40, which states the following:

> (a) Petitions to intervene shall be in conformity with section 12-201-20 herein and shall be filed with the commission and served upon the applicant no less than ten days before the first public hearing date. Untimely petitions will not be permitted except for good cause, but in no event will intervention be permitted after the commission has taken the final vote on the matter before it.
>
> (b) The petition to intervene shall be accompanied by a filing fee in the amount established in the county budget.

(Emphases added.) "Good cause" is not defined in the MPC rules. Thus, Appellants ask this court to construe the term consistent with RPPMPC Rule 12-201-41(d) (eff. 2010), which states, "Leave to intervene shall be freely granted[.]" Appellants disregard subsection (b) of the same rule, however, which states that "[a]ll persons who . . . can demonstrate they will be so directly and immediately affected by the matter before the commission that their interest in the proceeding is clearly

16

distinguishable from that of the general public shall be admitted as parties upon <u>timely</u> application for intervention." RPPMPC Rule 12-201-41(b) (eff. 2010) (emphasis added).  Thus, RPPMPC Rule 12-201-41 governs <u>timely</u> filed petitions for intervention.  Appellants do not show how MPC's rules require it to freely grant <u>untimely</u> petitions to intervene.

Appellants also argue that the public policy behind the Hawai'i Administrative Procedures Act (**HAPA**), as well as HRS Chapter 205 (governing the Land Use Commission), is to encourage public participation, citing <u>Life of the Land, Inc. v. West Beach Development Corporation</u>, 63 Haw. 529, 532, 631 P.2d 588, 591 (1981) ("[T]he legislative policy manifested in . . . HAPA and chapter 205 . . . requires a high degree of openness in the conduct of [Land Use] Commission affairs, dictates strict time constraints, encourages broad public participation with intervention to be freely granted, and mandates content requisites and specificity in all notices to the public as to all intended business of the Commission affecting private and public rights.").  We recognize the importance of these purposes.  Nevertheless, again, for intervention to be freely granted, it must first be timely.  <u>Cf.</u> <u>Pele Def. Fund v. Puna Geothermal Venture</u>, 77 Hawai'i 64, 67-68, 881 P.2d 1210, 1213-14 (1994) ("Appellants seeking judicial review under HRS § 91-14 must also follow agency rules 'relating to contested case

17

proceedings . . . properly promulgated under HRS Chapter 91[.]'") (citation omitted).

Appellants ask this court to define "good cause" for an untimely petition to intervene by adopting the "good cause" standard for setting aside an entry of default adopted in Chen v. Mah, 146 Hawai'i 157, 180, 457 P.3d 796, 819 (2020). The court rule at issue in Chen, the circumstances of that case, and the underlying policies therein differ markedly from this case. Chen made it clear that whether "good cause" exists will depend on the circumstances of the individual case. Id. Therefore, we conclude the Chen good cause standard for setting aside an entry of default is not appropriate in this case.

Chen involved a dispute over an oral compensation agreement between two dentists, plaintiff Dr. Grace Chen (**Chen**) and defendant Dr. Jonathan Mah (**Mah**). Id. at 160, 457 P.3d at 799. Chen threatened to file suit against Mah for money owed under the agreement. Id. at 162, 457 P.3d at 801. Her attorney sought accountings from Mah multiple times in an attempt to resolve the dispute without resort to litigation. Id. at 162-63, 457 P.3d at 801-02. After a final, unsuccessful attempt, Chen's attorney informed Mah he was recommending that Chen file suit. Id. at 163, 457 P.3d at 802.

Chen's complaint was filed and served upon Mah personally and as the registered agent for his corporation,

18

neither filed an answer, and Chen moved for, and was granted, entry of default.  Id.  Chen later moved for default judgment. Id.  At this point in the litigation, Mah obtained counsel and moved to set aside the entry of default.  Id.  He alleged that he had only recently learned of the entry of default against him and that he believed he was still in the process of negotiating a resolution with Chen's attorney.  Id. at 163-64, 457 P.3d at 802-03.  The circuit court denied Mah's motion to set aside entry of default.  Id. at 164, 457 P.3d at 803.  The issue of whether the circuit court abused its discretion in so ruling was ultimately appealed to this court.  Id. at 171, 457 P.3d at 810.

We examined the "good cause" requirement in Hawai'i Rules of Civil Procedure (**HRCP**) Rule 55(c), which is titled "Setting aside default," and which states, "For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)."  146 Hawai'i at 172, 457 P.3d at 811.  At the time Chen was decided, a party moving to set aside an entry of default for good cause also had to meet the same standard for setting aside a default judgment.  Id. at 160, 457 P.3d at 799.  The moving party had to show that "(1) the nondefaulting party will not be prejudiced by the reopening, (2) that the defaulting party has a meritorious defense, and (3) that the default was not the result of inexcusable conduct or a

19

wilful act." Id. at 172-73, 457 P.3d at 811-12 (quoting BDM, Inc. v. Sageco, Inc., 57 Haw. 73, 76, 549 P.2d 1147, 1150 (1976)).

This court in Chen changed the standard for setting aside an entry of default, prospectively holding that the movant needed to show the following:

> "Good cause" should exist to set aside an entry of default if: (1) the defendant did not deliberately fail to plead or otherwise defend or engage in contumacious conduct; or (b) if the defendant did deliberately fail to plead or otherwise defend or engage in contumacious conduct, there is no actual prejudice to the plaintiff that cannot be addressed through lesser sanctions.

Id. at 180, 457 P.3d at 819 (emphasis added and footnotes omitted). "Contumacious conduct" has been defined as "willfully defiant" or "[w]illfully stubborn and disobedient conduct." Id. at 180 n.27, 457 P.3d at 819 n.27 (citing In re Blaisdell, 125 Hawai'i 44, 50, 252 P.3d 63, 69 (2011); Shasteen, Inc. v. Hilton Haw. Vill. Joint Venture, 79 Hawai'i 103, 107 n.7, 899 P.2d 386, 390 n.7 (1995)).

In reaching this holding, this court noted that "[i]t is not possible to provide one definition of 'good cause,' as standards governing whether 'good cause' exists depend not only upon the circumstances of the individual case, but also upon the specific court rule at issue." Id. at 178, 457 P.3d at 817. This is because "there are numerous court rules in which the phrase 'good cause' appears," and these govern contexts that

20

"differ from the 'good cause' required to set aside an entry of default . . . and address different policy considerations dictating stricter or more lenient definitions of 'good cause'. . . ." Id. (footnotes omitted).

In the case of entries of default, this court stated that our express policy is one of disfavoring defaults so that, "in the interests of justice, there can be a full trial on the merits." Id. at 176, 457 P.3d at 815 (citations omitted). For that reason, the "good cause" standard in the context of HRCP Rule 55(c) is somewhat strict. Setting aside an entry of default requires an absence of contumacious conduct; or, if contumacious conduct is present, no actual prejudice to the plaintiff that cannot be addressed through lesser sanctions. Id. at 180, 457 P.3d at 819 (footnotes omitted). This "good cause" standard is appropriate at the beginning stages of litigation, where entry of default against a party precludes a full trial on the merits. Where there is an absence of contumacious conduct, the entry of default should be set aside.

In the case of an agency's exercise of discretion in excusing or not excusing an untimely petition to intervene, "good cause" need not be defined so strictly. In Chen, we emphasized the point that a finding of good cause "depends upon the circumstances of the individual case" and "lies largely in the discretion of the officer or court to which [the] decision

21

is committed." Id. at 178, 457 P.3d at 817 (quoting Doe v. Doe, 98 Hawai'i 144, 154, 44 P.3d 1085, 1095 (2002)).

This court acknowledged the Doe court's use of a simpler definition, taken from Black's Law Dictionary, in defining "good cause" as "[a] legally sufficient reason." Id. at 178 n.22, 457 P.3d at 817 n.22. Doe involved a child custody proceeding that was limited to three hours long. 98 Hawai'i at 145, 44 P.3d at 1086. At the conclusion of the hearing, mother lost custody of her minor daughter. Id. She filed a Hawai'i Family Court Rule (**HFCR**) 59(a) (eff. 2000) motion for a new trial, arguing that good cause existed to enter additional testimony from her witnesses concerning family violence. Id. at 148, 44 P.3d at 1089. HFCR Rule 59(a) states, "A new trial may be granted . . . for good cause shown. On a motion for a new trial, the court may . . . take additional testimony. . . ." The family court denied the motion on the basis that the proceeding was limited to three hours long. Id. at 152, 44 P.3d at 1093.

The Doe court then examined the phrase "good cause" in other contexts, such as in a Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 4(a)(5) extension of time for filing a notice of appeal, an HRS § 286-259(j) continuance of an administrative driver's license revocation hearing, or, in the employment context, the "leaving of work" for "good cause." Id. at 153-54,

22

44 P.3d at 1094-95 (citations omitted). It noted that the definition of "good cause" in each of those contexts varies. Id. at 153, 44 P.3d at 1094. Like the Chen court, the Doe court recognized that "'[g]ood cause . . . 'depends upon the circumstances of the individual case, and a finding of its existence lies largely in the discretion of the officer or court to which [the] decision is committed." Id. at 154, 44 P.3d at 1095 (citation omitted). The Doe court then applied the Black's Law Dictionary standard to mother's HFCR Rule 59(a) motion and concluded that the family court abused its discretion in denying her motion for a new trial because mother's witnesses "would have been helpful to resolve the underlying issue of domestic violence. . . ." Id. at 156, 44 P.3d at 1097. Such a standard would be more appropriate in the agency context as well.

As we noted in Chen, the definition of "good cause" "depend[s] not only upon the circumstances of the individual case, but also upon the specific court rule at issue[,]" and that the body to which the decision is committed possesses wide discretion in determining what constitutes "good cause." 146 Hawai'i at 178, 457 P.3d at 817. We decline to hold that the MPC abused its discretion in using a "good cause" standard consistent with the definition from Black's Law Dictionary. "Good cause," interpreted as a "sufficient reason," was appropriate for the context in which it was used.

23

This court has also adopted this Black's Law Dictionary definition of good cause for purposes of interpreting HRAP Rule 4(a)(4) (eff. 2016).[1]  See Eckard Brandes, Inc. v. Dep't of Lab. and Indus. Rels., 146 Hawai'i 354, 463 P.3d 1011 (2020).  The genesis of that appeal was a wage complaint by a truck operator, Scott Foyt (**Foyt**), against his employer, Eckard Brandes, Inc. (**Eckard**).  Id. at 355, 463 P.3d at 1012.  The Wage Standards Division of the Department of Labor and Industrial Relations (**DLIR**) sided with Foyt and issued a Notice of Violation to Eckard, ordering it to pay Foyt in excess of $60,000.  Id. at 356, 463 P.3d at 1013.

Eckard appealed the Notice of Violation to the Director of DLIR, and a hearing officer affirmed it.  Id.  In that proceeding, only Eckard and the DLIR were parties; Foyt was a witness.  Id.  Eckard then filed a notice of appeal to the circuit court.  Id.  Again, only Eckard and DLIR were parties.  Id. at 356-57, 463 P.3d at 1013-14.  The circuit court reversed

---

[1]    HRAP Rule 4 is titled, "APPEALS – WHEN TAKEN."  Subsection (a) governs "Appeals in civil cases."  HRAP Rule 4(a)(4) is titled, "EXTENSIONS OF TIME TO FILE THE NOTICE OF APPEAL."  For requests for extensions of time made before the expiration of the prescribed time to file an appeal has elapsed, the "court or agency appealed from, upon a showing of good cause, may extend the time for filing a notice of appeal upon motion. . . ."  (Emphasis added.)  HRAP Rule 4(a)(4)(A).  For requests for extensions of time made after the expiration of the prescribed time to file a notice of appeal has elapsed, the "court or agency appealed from, upon a showing of excusable neglect may extend the time for filing a notice of appeal upon motion. . . ."  HRAP Rule 4(a)(4)(B).

the DLIR Director's decision and entered final judgment.  Id. at 357, 463 P.3d at 1014.

Foyt did not find out about the decision until later, then spent weeks trying to obtain counsel.  Id.  He obtained counsel a day before the deadline to file a notice of appeal to the ICA.  Id.  Foyt's counsel then filed two motions:  the first for leave to intervene for the sole purpose of appealing the final judgment, and the second for an extension of time to file a notice of appeal from the final judgment.  Id.  The circuit court granted both motions, with the extension of time granted in part, due to "excusable neglect."  Id. at 358, 463 P.3d at 1015.  Foyt's counsel then filed his notice of appeal to the ICA, but the ICA dismissed his appeal as untimely, holding that the record did not establish excusable neglect.  Id.

Foyt's counsel later received an extension of time from the circuit court due to excusable neglect to file his notice of appeal.  Id. at 358, 463 P.3d at 1015.  He filed his notice of appeal to the ICA, but the ICA dismissed his appeal as untimely, holding that the record did not establish excusable neglect.  Id.

On certiorari, this court vacated the ICA's dismissal order and set forth definitions for "excusable neglect" and "good cause."  Id. at 363-64, 463 P.3d at 1020-21.  Relevant to this appeal, this court favorably cited Doe's use of the "good

25

cause" definition from Black's Law Dictionary, then favorably cited the Chen court's footnote of the updated definition in Black's Law Dictionary. Id. at 363, 463 P.3d at 1020 (citations omitted). We then defined "good cause" for the purposes of HRAP Rule 4(a)(4)(A) to mean "a sufficient reason, depending upon the circumstances of the individual case, and that a finding of its existence lies largely in the discretion of the court." Id. (footnote omitted). Eckard was published just three months after Chen and reiterated Chen's point that the definition of "good cause" depends upon the context within which the term is used. See id. In this case, it is neither necessary nor appropriate to graft Chen's "lack of contumacious conduct" definition of "good cause" onto the MPC's determination as to whether to excuse the untimeliness of Appellants' petition to intervene.

The MPC should not be required to accept untimely petitions to intervene on the basis that the intervenors did not engage in "willfully defiant" or "willfully stubborn and disobedient conduct." See Chen, 146 Hawaiʻi at 180 n.27, 457 P.3d at 819 n.27 (citations omitted).

By the time the SUP application was ready for a public hearing, the applicant, the MPD, and the MPC were near the culmination of the decision-making process. Here, Goodfellow submitted its SUP application in January 2021, and the public

26

hearing on its application was held in August 2023. For this particular SUP application, the SUP documents were available online from January 2021; Goodfellow held an initial informational Zoom session in September 2022 for Appellants' homeowners association; Goodfellow notified adjoining and abutting landowners directly in early July 2023 and published a notice in The Maui News on July 7, 2023; and Goodfellow again reached out in early July 2023 and held another informational session for Appellants' homeowners association in August 2023. Goodfellow engaged in community outreach above and beyond the required notice for its SUP application. As to the Appellants, notice by publication on July 7, 2023, was the required notice. That notice clearly stated that potential intervenors had until July 25, 2023, to petition to intervene.

Appellants sought to intervene less than 24 hours before the public hearing. Two of the six MPC commissioners had not received the petition to intervene by the time the hearing began. The proceedings had to be recessed for the commissioners to review the petition. Under these circumstances, a "good cause" standard consisting of a "sufficient reason" was well suited for the determination the MPC was required to make: did Appellants provide a sufficient reason for why their petition to intervene was untimely filed? The MPC engaged in a detailed inquiry to assess whether there was good cause for the untimely

petition to intervene. Here, the MPC did not abuse its discretion in finding and concluding that Appellants failed to show "good cause," meaning a "sufficient reason," for the untimely filing of their petition to intervene. See Chen, 146 Hawai'i at 178, 457 P.3d at 817 (noting that the "good cause" determination lies largely in the discretion of the officer or court to which the discretion is committed). Notice by publication was required with respect to Appellants, and it was properly given in this case. Goodfellow also made the additional effort to twice reach out to the Makila Plantation Homeowners Association in September 2022 and early July 2023, and to hold two informational meetings with those homeowners. Appellant Black attended the September 2022 informational meeting, which was held via Zoom and thus would have allowed those off island at that time to also participate. So for instance, Appellant Michael Morrison, who testified he was "not in the state" at the time, could have still attended. Appellants failed to file their petition to intervene by the deadline and instead waited until the afternoon of the day before the hearing to file their petition.

In these circumstances, we hold the MPC did not abuse its discretion in deciding that Appellants had not shown good cause, *i.e.* a sufficient reason, for the untimely filing of their petition to intervene.

28

**B.    The MPC was not required to hold a contested case hearing on the untimely petition to intervene.**

As to Appellants' first point of error, the MPC was not required to hold a contested case hearing with respect to Appellants' untimely petition to intervene within Goodfellow's contested case hearing on its SUP application.  The MPC properly heard Appellants' arguments regarding why their petition to intervene was filed the day before the hearing.  Appellants Black, Saulsbury, and Michael Morrison testified as to when they became aware of Goodfellow's SUP application.  That information was relevant to the MPC's good cause decision and a contested case hearing was not required as to whether there was good cause for the untimely filing of the petition to intervene.

**C.    There is no evidence the MPC based its denial of Appellants' untimely petition to intervene on Appellants' residency status.**

As to Appellants' third point of error, there is no evidence in the decision-making portion of the minutes from the MPC's public hearing, or in its written Decision, that Appellants' residency status played any role in its denial of Appellants' untimely petition to intervene.  We conclude this point of error lacks merit.

**D.    We do not reach Appellants' fourth point of error.**

Given our conclusions above, Appellants were not parties to Goodfellow's SUP application contested case.  We

therefore do not reach Appellants' challenge to the merits of the SUP approval.  In order for Appellants to challenge the SUP approval, the following requirements must be met:

> **[F]irst**, the proceeding that resulted in the unfavorable agency action must have been a "contested case" hearing . . . , **second**, the agency's action must represent "a final decision and order," or "a preliminary ruling" such that deferral of review would deprive the claimant of adequate relief; **third**, <u>the claimant must have followed the applicable agency rules and, therefore, have been involved "in" the contested case</u>; and **finally**, the claimant's legal interests must have been injured. . . .

<u>Kaleikini v. Thielen</u>, 124 Hawai'i 1, 16-17, 237 P.3d 1067, 1082-83 (2010) (bold emphasis in original and underscored emphasis added) (quoting <u>Pub. Access Shoreline Haw. by Rothstein v. Haw. Cnty. Plan. Comm'n by Fujimoto</u>, 79 Hawai'i 425, 431, 903 P.2d 1246, 1252 (1995)).  Here, Appellants did not meet the third requirement.

## IV.  Conclusion

For the foregoing reasons, the MPC's Decision is affirmed.

| | |
|---|---|
| Linda J. Nye and Lance D. Collins for appellants | /s/ Sabrina S. McKenna |
| | /s/ Todd W. Eddins |
| Christopher T. Goodin for appellee Goodfellow Bros., LLC | /s/ Lisa M. Ginoza |
| | /s/ Ronald G. Johnson |
| | /s/ Wendy M. DeWeese |

